IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
At Kansas City, Kansas

| | |
|---|---|
| **MARIA VARNAS as Special Administrator of the Estate of Brandon S. Lynch, Deceased**, | )<br>)<br>) |
| Plaintiff, | ) |
| *vs.* | ) |
| **CONNER THOMPSON**, | ) |
| and | ) |
| **THE CITY OF OLATHE, KANSAS,**<br>     Serve Counsel at:<br>     Michael Seck<br>     Fisher Patterson Sayler & Smith<br>     9393 West 110th Street, Suite 300<br>     Overland Park, Kansas 66210 | )<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## PLAINTIFF'S COMPLAINT

Plaintiff, Maria Varnas as Special Administrator on behalf of the estate of decedent, Brandon Lynch, states and alleges the following in support of the causes of actions against defendants Conner Thompson and the City of Olathe, Kansas.

**PARTIES**

1. Plaintiff, Maria Varnas, is the mother and duly appointed Special Administrator of the Estate of Brandon Lynch, deceased, having been duly appointed by the Probate Division of Johnson County, Kansas in case no. 23PR00412.

2. Defendant Conner Thompson (hereinafter referred to as "defendant Thompson") was at all relevant times mentioned herein a duly sworn law enforcement officer for the City of Olathe, Kansas Police Department and is being sued in his individual and official capacity. At all

1

times mentioned herein, defendant Thompson was acting under the color of state law. At all times relevant defendant Thompson was acting within the course and scope of his employment with defendant City of Olathe, Kansas and had final policy making authority concerning police activities. Additionally, the defendant was responsible for the administration, implementation and authorization of police services.

3.      Defendant City of Olathe, Kansas is a municipality acting through its constituent, the Olathe, Kansas Police Department (hereinafter referred to as "defendant O.P.D."). The O.P.D. is located in Johnson County, Kansas. Defendant O.P.D. had final policymaking authority regarding the Olathe, Kansas Police Department and primary responsibility for the administration of activities and services of the Olathe Police Department. In addition, the defendant O.P.D. is in charge of, a policymaker for, authorizes, and implements the policies, procedures, rules, regulations and guidelines of the Olathe Police Department. At all relevant times defendant O.P.D. was the public employer of defendant Thompson.

## VENUE AND JURISDICTION

4.      Venue is proper in this Court pursuant to 28 U.S.C.A. § 1391(b) and (e) as the events and/or acts and/or omissions giving rise to this Complaint occurred in Johnson County, Kansas, which lies within the District of Kansas, and because defendants were performing their respective duties and responsibilities within the District of Kansas. Additionally, the parties reside, or, at the time the events took place, resided in this judicial district.

5.      This Court has jurisdiction over plaintiff's federal constitutional claims pursuant to 42 U.S.C. § 1983, 28 U.S.C. §§ 1343, 1331, 1332 and the 4th and 14th Amendments to the Constitution of the United States. This Court also has jurisdiction pursuant to 42 U.S.C. §1988 to award and allocate attorney fees which are specifically requested in plaintiff's prayer for relief.

## FACTS COMMON TO ALL COUNTS

6. At the time of the shooting described herein, Brandon was a 27-year-old man suffering from behavioral and mental health symptoms.

7. Brandon lived with his mother, Maria Varnas, in the family residence located in Johnson County, Kansas.

8. During the evening of December 31, 2022, Brandon was at home with his younger sister, M.L., when he became agitated, irritable, and paranoid about getting the plague.

9. After a physical altercation, and as instructed on prior occasions by Brandon's case worker, at approximately 11:10 p.m. M.L. called 911 to get help for her brother. She reported to the dispatcher that Brandon had a history of schizophrenia, paranoia and was in crisis.

10. Defendants were aware of Brandon's schizophrenic diagnosis and history with the department's mental health crisis assessment team, which was also confirmed via law enforcement dispatch radio communication.

11. Radio chatter at the time stated: "Just information: There's a lot of CAT (Crisis Assessment Team) history here. Also, with Brandon — Brandon Lynch — he's diagnosed, schizophrenia. They had (garbled) disturbance here involving a knife in May. And then one before that, previously, maybe the year before. Think it was just with kitchen knives. ... At the moment she's in the bedroom and doesn't know where he's at."

12. Both responding officers had previous contact with Brandon and were aware of his behavioral and mental health symptoms.

13. Defendant Thompson had a physical altercation with Brandon during a previous incident.

14. Responding officers, including Defendant Thompson, arrived at approximately 11:14 p.m. and met M.L. at the front door, who reported that Brandon was located in his basement bedroom.

15. Officers instructed M.L. to exit the home and she complied, waiting safely outside in the front yard during the officers' encounter with Brandon.

16. Officers proceeded downstairs, approached Brandon and attempted to communicate with him. Brandon responded, "Get out sir," followed by multiple requests to get out. He further indicated he was trying to clean to avoid starting a new plague.

17. Without exhibiting any signs of aggression towards the officers, Brandon shouted, "I'm not going anywhere near you" and attempted to retreat from the interaction. He walked back into his bedroom and closed the door.

18. After Brandon retreated and closed his bedroom door, the O.P.D. officers opened his bedroom door and continued shouting commands at him. *See the photograph below from officer body worn camera.*



19. Defendant Thompson immediately pulled out a taser weapon and aimed it at Brandon after opening the door despite Brandon not making any threats.



20. Defendant Thompson pulled his firearm and aimed it at Brandon less than fifteen seconds after pulling his taser.



21. There was absolutely no reasonable basis for defendant Thompson to un-holster

his firearm at this time or any point in the interaction.

22. The officers told him he was under arrest. Brandon became increasingly agitated and asked the officers to leave his house multiple times.

23. Next, the officers started to back down the hallway and Brandon followed the officers upstairs to his home's living room.

24. At this point, the O.P.D. officers were aware that Brandon was alone inside the house and posed no danger to M.L., who was waiting safely outside.

25. Defendant Thompson took a position in the front doorway.

26. The house exterior wooden door is protected by a storm door, which includes a strong tensioned closing mechanism that returns the door to a closed position if it is not held open. *See the photograph below depicting front door configuration.*



6

27. The second O.P.D. officer stood slightly behind and next to Defendant Thompson, holding open the storm door.

28. Brandon walked back and forth in his living room, approximately 12-15 feet from the home's entryway, while the officers stood at the threshold of the front door.

29. One officer unsuccessfully attempted to deploy a taser toward Brandon.

30. After the officer attempted to stun Brandon with the taser, Brandon did not make any hostile motions towards the officers. Brandon's hands remained at his side, and he continued to pace side to side, not moving towards the officers plainly displaying that he was in mental health crisis.

31. At 11:18 p.m., just over four minutes after the officers arrived, radio chatter confirmed "Olathe just put out an assist the officer ... East Oakview."

32. Brandon kept his hands at his sides as he continued to pace in his living room.



33. Defendant Thompson kept his weapon pointed at Brandon and instructed him to drop the knife.

34. Brandon made no hostile motions toward the officers. He did not make any threatening gestures toward anyone during the interaction. He repeatedly asked the officers to leave his house.

35. At this time, sirens could be heard in the background as additional backup officers arrived outside the home.

36. Instead of simply closing the door and consulting with the arriving backup officers to develop a de-escalation plan, Defendant Thompson again instructed Brandon to drop the knife and warned him not to move forward.

37. Throughout the interaction, the officers escalated the situation by pointing guns, shouting commands, and threatening Brandon. Crisis intervention training teaches that these tactics exacerbate the situation and are counter productive in addressing a person in mental health crisis.

38. Brandon said his last words, "What did I do? I didn't do anything. Get out of my house. Get out of my …"

39. At approximately 11:19 p.m., Brandon took one or two steps forward at a slow pace. Defendant Thompson fired three shots at Brandon's torso fatally wounding him before he was within striking distance of the officers.

40. Brandon's actions never posed a threat to defendant Thompson or the safety of any police officers. Defendant Thompson was not in danger at any point during the moments leading up to the time that he took Brandon's life. Defendant Thompson was not in danger of being harmed by Brandon because he was standing at a safe distance outside of the striking zone

and the front door was a barrier between Defendant Thompson and Brandon.

41. Defendant Thompson recklessly created the situation resulting in use of excessive and deadly force as he continued to shout at, threaten and agitate Brandon, a person with known behavioral and mental health symptoms, when no one was in danger. M.L. remained safely outside of the home and the officers were at a safe distance from Brandon with a barrier in between them and assistance on the way.

42. Despite other officers being on the scene while these events unfolded, none fired their weapon except Defendant Thompson.

43. Defendant Thompson did not reasonably believe it was necessary to use deadly force. He acted recklessly and deliberately when he shot and killed Brandon. Brandon's alleged conduct of holding a small knife at his side did not justify or necessitate defendant Thompson shooting at him or taking his life.

44. At 11:31 p.m., Brandon Lynch was pronounced dead from multiple gunshot wounds to his torso.

**COUNT I**
**42 U.S.C. § 1983 - Use of Excessive Force Violation of Fourth & Fourteenth Amendments**
**(Plaintiff vs. Defendant Thompson)**

45. Plaintiff incorporates by reference all previous paragraphs as though fully set forth herein.

46. The Fourth Amendment provides that citizens of the United States are to be free from unreasonable search and seizures of their person, and prohibits the use of excessive force against citizens, including Plaintiff.

47. Defendants knew or should have known that the Fourth Amendment prohibits the use of excessive force against citizens, including Plaintiff.

9

48. Defendant Thompson used excessive force in violation of the constitutional rights of Plaintiff when he shot and killed Brandon Lynch.

49. Defendants acted or failed to act under the color of state law at relevant times herein. Defendant Thompson acting under the color of state law, caused Brandon Lynch's constitutional rights to be deprived.

50. The degree of force used by defendant Thompson was excessive because the amount of force used, which resulted in Brandon Lynch's death, was not reasonable or necessary under the circumstances and was not that of a reasonable officer under the circumstances. Had defendant Thompson not used the degree of force described herein, Brandon Lynch would be alive.

51. Defendant Thompson knew or should have known the amount of force used and the manner in which he shot at and killed Brandon Lynch was not that of a reasonable officer under the circumstances.

52. Defendant Thompson knew or should have known the excessive force exerted by him and set forth with more particularity above violated the constitutional rights of Brandon Lynch to be free from unreasonable seizure and excessive force.

53. Defendant Thompson used excessive and deadly force in violation of the constitutional rights of Brandon Lynch when he shot decedent Brandon Lynch after responding to a call about Brandon's mental health crisis. An actionable seizure occurred pursuant to the Fourth Amendment when Brandon Lynch was shot and eventually lost his life as a result. This seizure was unreasonable in light of the facts and circumstances alleged herein.

54. The degree of force used by defendant Thompson was excessive because it was not reasonably necessary to interact with or check the welfare of Brandon Lynch.

55. Defendant Thompson unnecessarily escalated the situation when he un-holstered his weapon, took aim at Brandon Lynch unnecessarily near a person with mental health symptoms in crisis. Defendant Thompson unnecessarily failed to move further away from Brandon Lynch to a safe area outside the home to wait for assistance when it was the easiest and most reasonable option.

56. Defendant Thompson unnecessarily escalated the situation by failing to take an appropriate officer safety position when interacting with Brandon Lynch, a person known to be in crisis, and failed to address the situation as required by his training and O.P.D. policies and procedures. He unnecessarily fired three shots at Brandon Lynch when Brandon was not within striking distance or in close enough range to Officer Thompson to be considered dangerous.

57. Defendant Thompson failed to take other more reasonable, readily available, and non-life threating methods to deescalate the crisis, prevent injuries, provide appropriate services for Brandon Lynch.

58. Crisis intervention training teaches officers to use a calm and non-threatening tone, ask open-ended questions, and avoid confrontational language. Defendant Thompson failed to use any crisis intervention techniques.

59. Defendant Thompson relied on force and aggression and failed to employ empathy, active listening, and a calm non-threatening to build rapport and trust with Brandon.

60. No reasonable officer in the position of defendant Thompson would have used deadly force in shooting the subject of a crisis intervention when said person merely took one step toward officer with his hands at his side and did not charge the officers, did not make aggressive motions with a knife, and did not make any hostile provocation actions towards the officers.

61. Any reasonable officer would have known that shooting at Brandon three times under these circumstances was an unlawful and unreasonable use of excessive force.

62. Defendant Thompson's own reckless and deliberate conduct described herein unreasonably created the situation in which defendant Thompson unreasonably shot decedent Brandon Lynch and caused his death.

63. The acts of defendant Thompson were wanton, malicious, evil, oppressive or involved reckless indifference to the federally protected rights of decedent, Brandon Lynch, thus entitling plaintiff to an award of punitive or exemplary damages against defendant Thompson.

64. The conduct of defendant has caused plaintiff damages including, but not limited to:

   a. Pain, suffering, fear, anxiety, emotional distress prior to his death,

   b. Physical pain and suffering from the gunshot wounds prior to his death,

   c. The knowledge of impending death,

   d. The loss of income, filial care, attention, services, guidance, advice, care and companionship,

   e. Economic damages associate with his death including funeral expenses and medical care provided, and

   f. The loss of his life.

65. Plaintiff is entitled to recover from defendant reasonable attorney fees and expenses provided by 42 U.S.C. § 1988.

WHEREFORE, plaintiff requests that the Court, after a trial by jury of the claims, enter judgment against defendant, for their actual damages, compensatory damages or nominal damages, for punitive or exemplary damages, for attorney fees and expenses pursuant to 42

U.S.C. § 1988, the costs, and for any relief the Court deems necessary and just.

## COUNT II
### 42 U.S.C. § 1983 - Violative Policies, Procedures, Practices and Customs
### (Plaintiff vs. Defendant O.P.D.)

66. Plaintiff incorporates by reference all previous paragraphs as though fully set forth herein.

67. There existed within the defendant Olathe Police Department policies, procedures, customs, practices or usages that are so pervasive, that they constitute the policy of the Olathe Police department and are the moving force behind the constitutional deprivations of decedent Brandon Lynch and caused damages as previously stated.

68. The policies, practices, procedures, customs and usages that exist are:

   a. That officers of the Olathe Police Department use excessive force, including deadly force, without regard for the need for the use of force, or without regard for the legality of its use;

   b. That officers of the Olathe Police Department can use excessive force when it is not necessary and warranted where the O.P.D. failed to take action or adequately punish officers that violate the constitutional rights of its citizens as more fully described above;

   c. That officers of the Olathe Police Department engage in conduct that is violative of the constitutional rights of its citizens of the United States, with whom they come in contact, including but not limited to: unjustifiably detaining and/or shooting people in violation of the Constitution of the United States;

   d. That defendant Olathe Police Department willfully and deliberately fail to supervise and train its officers when lethal force can and should be used, and allows its officers to use deadly force when it is not warranted or called for in violation of citizens' constitutional rights;

   e. That officers of the Olathe Police Department are not fully or properly trained on how to respond to a crisis intervention call for service and are allowed to respond to said calls without direction and in an inconsistent manner;

   f. That officers of the Olathe Police Department are not properly trained or instructed on how to safely deescalate a crisis situation, prevent injuries, provide appropriate services and are allowed to approach in the manner described with

more specificity herein; and

g. That officers of the Olathe Police Department are allowed to undertake the activities described with more specificity herein.

69. Defendant O.P.D. is and was vested with the authority to train, supervise, discipline, and otherwise control the officers of the Olathe Police Department. Defendant Olathe Police Department failed to change its orders, policies, procedures, practices, customs, and usages by failing to properly hire, train, supervise, discipline, and control the officers of the Olathe Police Department including failing to act in the face of transgressions, deficiencies, and unconstitutional conduct of its officers of which they knew or should have known.

70. As the lawfully designated policy making body, defendant O.P.D. has the power and responsibility to prevent the existence of the conduct, policies, procedures, practices and customs which violate the constitutional rights of citizens of the United States, and have failed to and refused to do so, and, therefore, has been and continues to be deliberately indifferent to the rights of the citizens of the United States, with whom the police officers of Olathe come in contact. The failure of defendant Olathe Police Department to act in the face of constitutionally violative conduct caused the constitutional deprivations that have been suffered by decedent Brandon Lynch.

71. There exists within the O.P.D. employee hiring, training and supervision and retention policies, procedures and practices that are so pervasive they constitute the policy of O.P.D. and were a moving force behind and thereby caused the constitutional deprivations suffered by plaintiff. There has been a failure to adopt employee hiring, training, supervision and retention policies, procedures and practices which would have prevented the constitutional deprivations suffered by plaintiff alleged herein.

72. Defendant Olathe Police Department enacted, condoned, ratified and allowed the

policies, procedures, practices, customs, and usages set above which caused or contributed to cause the unconstitutional violations and death of Brandon Lynch, and damages sustained by Brandon Lynch.

73. In their failures, policies, procedures, practices, customs and usages, as previously described, defendant O.P.D. intentionally disregarded known facts or alternatively, was deliberately indifferent to a risk of constitutional violation of which they knew or should have known, and their culpability caused the constitutional violations to decedent Brandon Lynch in causing his death and the damages to Brandon Lynch.

74. The acts of defendant were wanton, malicious, evil, oppressive or involved reckless indifference to the federally protected rights of decedent, Brandon Lynch, thus entitling plaintiff to an award of punitive or exemplary damages against defendant Thompson.

75. The policies, procedures, practices, customs and usages and conduct of defendant has caused plaintiff damages including but not limited to:

    a. Pain, suffering, fear, anxiety, emotional distress prior to his death,

    b. Physical pain and suffering from the gunshot wounds prior to his death,

    c. The knowledge of impending death,

    d. The loss of income, filial care, attention, services, guidance, advice, care and companionship,

    e. Economic damages associate with his death including funeral expenses and medical care provided, and

    f. The loss of his life.

76. Plaintiff is entitled to recover from defendants reasonable attorney fees and expenses provided by 42 U.S.C. § 1988.

WHEREFORE, plaintiff requests that the Court, after a trial by jury of the claims, enter judgment against defendant, for actual damages or nominal damages, for attorney's fees and expenses pursuant to 42 U.S.C.§ 1988, costs, for exemplary or punitive damages and for any other relief the Court deems necessary and just.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all counts.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff hereby designates United States District Court for the District of Kansas at Kansas City, Kansas as the place of trial.

**Respectfully submitted,**

**CANNEZZARO MARVEL, LLC**

*/s/Michelle Marvel*
Michelle Marvel        KS#23511
Nikki Cannezzaro       KS#20138
4717 Grand Ave., Suite 130
Kansas City, MO 64112
Phone: (816) 641-5600
Fax: (816) 641-5601
Email: mmarvel@cmlawkc.com
Email: nikki@cmlawkc.com
***ATTORNEYS FOR PLAINTIFF***