IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **MARIA VARNAS** as Special Administrator of the Estate of Brandon S. Lynch, Deceased, | ) ) ) |
| Plaintiff, | ) ) Case No. 2:24-cv-02193 |
| *vs*. | ) ) ) |
| **CONNER THOMPSON**, et al, | ) ) |
| Defendants. | ) |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS

Plaintiff Maria Varnas, as Special Administrator of the Estate of Brandon S. Lynch, in response to Defendants' Motion to Dismiss, states as follows:

### I. Introduction.

On December 31, 2022, Brandon Lynch was in crisis and needed help. His sister, M.L., needed help managing his mental health symptoms. M.L. believed the police would be equipped and competent to help them both - they had before. But, on this evening, officers from the Olathe Police Department failed the Lynches.

Officers Thompson and Willard arrived at the Lynch home fully aware that Brandon was schizophrenic and experiencing a manic episode. Rather than handle the situation in light of Brandon's condition, and follow known and effective de-escalation methods, Officer Thompson chose to enter Brandon's bedroom against his will, shout commands at him, and draw his weapons. When the encounter moved to the living room, Brandon and Officer Thompson were across the room from each other, approximately 12-15 feet apart. Brandon allegedly held a small knife loosely by his side, not making any hostile movements or antagonistic statements, pacing back and forth in obvious distress while Officer Thompson continued to escalate the situation. The encounter lasted less than two minutes and ended with Brandon shot dead on his living room floor.

1

The use of deadly force against Brandon Lynch was unreasonable and avoidable. The present motion asks whether, given the totality of the circumstances, a reasonable police officer would have believed Brandon posed a threat of serious harm. The answer is no. For the reasons set forth in more detail below, the Court should deny Defendants' motion.

**II. Standards of Review.**

Determining the appropriate standards of review requires the Court to first determine whether and to what extent it will consider materials not part of Plaintiff's initial Complaint. "When presented with a Rule 12(b)(6) motion, the district court has broad discretion in determining whether to accept materials beyond the pleadings." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017). "[A]s a general rule the court must either exclude the material or treat the motion as one for summary judgment." *Id.* (internal quotations omitted). *See also* Fed.R.Civ.P. 12(d). But, where the additional material is referenced in the complaint, is "central to the plaintiff's claim and the parties do not dispute [its] authenticity," the Court may still review the material without converting the motion to one for summary judgment. *Id.*

Defendants have filed with their Motion to Dismiss the body camera footage of defendant Thompson and non-party responding officer Willard, the Declaration of Major Wesley Smith (authenticating the two videos), and transcripts of the videos. The body camera footage was only available to Plaintiff in a redacted form at the time of filing.[1] Plaintiff does not object to the Court considering the body camera videos as they are referenced in the Complaint and contain information central to Plaintiff's claims. The Court need not accept as true the defense's one-sided characterizations of the body camera footage contained in their motion.

---

[1] Despite efforts to obtain relevant materials from the police files for this incident, plaintiff only received the full videos when the present motion was filed.

2

Plaintiff does, however, object to any consideration of the transcripts submitted by Defendants. These transcripts do not accurately portray the encounter or provide any additional clarity to what is seen and heard in the videos and, at times, provide conflicting accounts of what was said.  These were prepared as tools for defense counsel and should not be given any weight or consideration by the Court, as they are not, themselves, a legitimate form of evidence. The videos speak for themselves and should be considered for what they show and nothing more. *Jacobsen v. Deseret Book Co.*, 287 F.3d. 936, 941 (10th Cir. 2002).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Brokers' Choice of Am., Inc.*, 861 F.3d at 1104 (quoting *Iqbal*, 556 U.S. at 678). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Miller v. Glanz*, 948 F.2d 1562 (10th Cir. 1991).  Ruling on a motion to dismiss for failure to state a claim requires the Court to accept all well-pleaded facts as true, liberally construe the pleadings, and draw all reasonable inferences in favor of the non-moving party. *Brokers' Choice of Am. Inc.*, 861 F.3d at 1105.

On the other hand, "[s]ummary judgment is proper if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Halley v. Huckaby*, 902 F.3d 1136, 1143 (10th Cir. 2018); Fed.R.Civ.P. 56(a). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Schneider v. City of Grand*

*Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). Summary judgment motions turning on the defense of qualified immunity require the Court to determine whether the facts, taken in the light most favorable to Plaintiff, plausibly allege that the officer's conduct violated a constitutional right and the alleged right was clearly established at the time of the violation. *Zia Trust Co. v. Montoya*, 567 F.3d 1150, 1154 (10th Cir. 2010). *See also Estate of Ronquillo by & through Estate of Sanchez v. City & Cty. of Denver*, 720 F. App'x 434, 437 (10th Cir. 2017) (motions to dismiss also decided by the same qualified immunity inquiry). Viewing the facts and inferences in the light move favorable to the nonmoving usually means adopting plaintiff's version of the facts. *Estate of Taylor v. Salt Lake City*, 16 F.4th 744, 765 (10th Cir. 2021).

Here, because the body camera footage of both responding officers is referenced in the Complaint, is central to Plaintiff's claims, and their authenticity is not disputed, the Court can consider their contents without transforming the present motion into one for summary judgment. The Court need only look to the facts as alleged in Plaintiff's Complaint, along with the video footage, to conclude that dismissal is improper.

**III. Facts**

    **A. Response to Defendants' "Statement of Facts"**

Plaintiff admits the facts contained in paragraph 1.

Plaintiff admits the facts contained in paragraph 2 but further states this is an incomplete recitation of what is alleged in paragraph 3 of the Complaint. Notably, the Complaint alleges that, as relevant to the present case, Defendant City of Olathe acted through its constituent, the Olathe Police Department (O.P.D.), which has final policy making authority for and primary responsibility for the administration of O.P.D.

Plaintiff admits the facts contained in paragraph 3.

Plaintiff admits the facts contained in paragraph 4.

Plaintiff admits the facts contained in paragraph 5.[2]

Plaintiff admits the facts contained in paragraph 6.

Plaintiff admits the facts contained in paragraph 7.

Plaintiff admits the facts contained in paragraph 8.[3]

Plaintiff admits the facts contained in paragraph 9.

Plaintiff denies the facts as alleged in paragraph 10 as not accurately stating the course of events. The body camera footage shows that the officers only entered the home after talking to M.L., who confirmed the location of Brandon's bedroom. Plaintiff further alleges that Officer Thompson was aware of the location of Brandon's bedroom before ever approaching or entering the house. [Thompson Body Camera Video ("TBC") 0:50]. Plaintiff specifically disputes that Officer Thompson "first identif[ied] himself" as a police officer prior to entering Brandon's bedroom. [TBC 3:08].

Plaintiff denies the facts as alleged in paragraph 11 as not accurately stating the course of events. The body camera footage shows that Lynch said "Get out, sir" in response to Officer Thompson pushing his bedroom door open and before Thompson ever announced his presence. [TBC 3:08-3:10].

Plaintiff denies the facts as alleged in paragraph 12 as not accurately stating the course of events.

Plaintiff denies the facts as alleged in paragraph 13 as not accurately stating the course of events. Plaintiff admits that during the encounter, Thompson claims Lynch is holding a knife and instructed him to drop it.

---

[2] Plaintiff further states this is an incomplete recitation of the allegations contained in paragraphs 8-9 of the Complaint, and the Court should decide this motion by looking to the Complaint rather than Defendants' interpretation of its allegations.

[3] Paragraphs 8-18 of Defendants' Statement of Facts contain defense-friendly characterizations of the Thompson body camera footage and transcripts. The Court is not bound to accept defendants' characterization of the body camera footage. Instead, the video footage speaks for itself and should be considered separate and apart from Defendants' description of such.

Plaintiff denies the facts as alleged in paragraph 14 as not accurately stating the course of events.

Plaintiff denies the facts as alleged in paragraph 15 as not accurately stating the course of events. Specifically, plaintiff disputes that Officer Thompson warned Brandon by stating "Taser, taser, taser." It is not clear from the body camera footage which of the two officers made this statement and for what purpose.

Plaintiff denies the facts as alleged in paragraph 16 as not accurately stating the course of events. Specifically, plaintiff disputes the characterization of the distance between Brandon and Thompson as "close proximity." The facts, as alleged in Plaintiff's Complaint, are that the two were separated by a distance of 12-15 feet. Doc. 1 ¶ 28.

Plaintiff denies the facts as alleged in paragraph 17 as not accurately stating the course of events.

Plaintiff denies the facts as alleged in paragraph 18 as not accurately stating the course of events and not stating the facts in the light most favorable to plaintiff. Plaintiff specifically objects to the characterization that Brandon "advanced" on Thompson. The facts, as alleged in Plaintiff's Complaint and shown on the videos, are that Brandon took one or two steps towards Thompson at a slow pace before he fired his weapon, fatally shooting Brandon. Doc. 1 ¶ 39.

**B. Additional Relevant Facts.**

Defendants' version of events omits critical moments during the encounter between Officer Thompson and Brandon Lynch. Plaintiff's Complaint, along with the body camera footage, establishes the relevant facts. Plaintiff specifically incorporates by reference all facts alleged in the Complaint and all reasonable inferences drawn therefrom. Without re-detailing every frame of footage, Plaintiff alleges the following additional facts learned from viewing the video footage that were not known to Plaintiff at the time of filing:

1. Before approaching Brandon's closed bedroom door, Thompson radioed back up to come to the house. [TBC 3:00].

6

    2.      When Officer Thompson reached Brandon's bedroom, the door was closed. [TBC 3:06].

    3.      Officer Thompson then forced the door open without announcing his presence. [TBC 3:08].

    4.      After their initial interaction, Brandon closed the door to his bedroom. [TBC 3:24].

    5.      Officer Thompson again entered the bedroom against Brandon's will, and Brandon retreated farther into the bedroom. [TBC 3:25-3:28].

    6.      After entering the bedroom and allegedly observing Brandon holding a "stun gun,"[4] Officer Thompson drew his TASER and aimed it at Brandon. [TBC 3:29].

    7.      Officer Thompson then exchanged his TASER for his firearm and aimed it at Brandon while simultaneously stating, "put the knife down." [TBC 3:43].

    8.      Brandon asked the officers to leave his room numerous times. [TBC 3:07-3:48].

    9.      When the officers did not leave, Brandon took one or two steps into the hallway, leading the officers to retreat out of the basement to the front door, and Brandon followed. [TBC 3:48-3:57; Willard Body Camera Footage ("WBC") 3:40].

**IV. Plaintiff's Complaint Alleges Sufficient Facts to State a Claim for Excessive Force Claim Against Officer Thompson and Should not be Dismissed.**

"Every person has the right not to be subjected to unreasonable or excessive force while being arrested or detained by a police officer." *Zuchel v. Spinharney*, 890 F.2d 273, 274 (10th Cir. 1989). In response to a claim of unconstitutional excessive force, defendant officers may raise the affirmative defense of qualified immunity, which "protects government officials from personal liability unless their actions violate clearly established law of which a reasonable person would

---

[4] It is not clear from the body camera video if Brandon was holding a "stun gun" at the time of the incident, and therefore a factual dispute exists. However, it is important to note that a handheld stun gun is not a lethal weapon.

7

have known." *Id.* The defense of qualified immunity is overcome when a plaintiff shows that the defendant violated a clearly established constitutional right. *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008). "To establish a constitutional violation, the plaintiff must demonstrate the force used was objectively unreasonable." *Id.* Objective reasonableness is assessed by asking whether the totality of the circumstances justified the use of force. *Id.* at 1260. The reasonableness inquiry is a fact-intensive one requiring "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Ultimately, deadly force is only justified "if a reasonable officer in defendants' position would have had probable cause to believe that there was a *threat of serious physical harm to themselves* or others." *Estate of Larson*, 511 F.3d at 1260 (emphasis in original). "The totality of the circumstances include application of the *Graham* and *Estate of Larsen* factors to the *full encounter*, from its inception through the moment the officers employed force." *Estate of Taylor*, 16 F.4th at 765 (emphasis in original).

**A. The Facts Show That Officer Thompson Violated Brandon Lynch's Constitutional Right Against Unreasonable Seizures.**

The facts establish that Officer Thompson's use of deadly force against Brandon Lynch was objectively unreasonable. The *Graham* factors favor the Plaintiff and demand the conclusion that the totality of the circumstances did not justify the use of deadly force.

First, the severity of any alleged crime by Brandon was low. At most, Brandon committed assault and battery on M.L. prior to the officers' arrival. But this alleged crime does not rise to the level of severity that would have justified deadly force. Importantly, looking at the circumstances as they were presented to Officer Thompson at the exact moment of force, a reasonable jury could

conclude that after Thompson entered the home, Brandon's conduct never amounted to a crime. *See Ibarra v. Lee*, 2023 WL 6939236, at *11 (10th Cir. Oct. 20, 2023). Nothing that Brandon did while the officers were present could be construed as criminal.

The second *Graham* factor is "undoubtedly the most important and fact intensive." *Pauly v. White*, 874 F.3d 1197, 1215-16 (10th Cir. 2017). To assess the degree of threat facing officers, courts consider a number non-exclusive factors, including, "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larsen*, 511 F.3d at 1260. These factors, while significant, "are only aids in making the ultimate determination, which is 'whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force.'" *Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015) (quoting *Estate of Larsen*, 511 F.3d at 1260).

As an initial matter, there can be no reasonable argument the Brandon posed a threat to M.L. or the general public. M.L. was positioned safely outside the house, away from any potential harm during the whole encounter. The same is true for the general public. At all times, Brandon stayed within his home and did nothing to suggest he was attempting to escape and harm anyone. Importantly, consideration of the potential harm to others "does not mean that any risk of physical harm to others, no matter how slight, would justify any application of force, no matter how certain to cause death." *Cordova v. Aragon*, 569 F.3d 1183, 1190 (10th Cir. 2009). The key question, therefore, is the degree of threat Brandon posed to Officer Thompson.

Plaintiff concedes that Officer Thompson asked Brandon to drop the knife multiple times during their encounter. But, that alone cannot justify the use of deadly force — particularly when all the other factors support Plaintiff's case. Critically, Brandon never made any hostile motions

9

or gestures with the knife towards the officers. Nor did he make any verbal threats that would indicate antagonism or danger. He did not flail, slash, or otherwise brandish the weapon. In fact, quite the opposite. His hands remained by his sides at all times during the encounter. *See Tenorio*, 802 F.3d at 1164 (finding in favor of suspect that was "merely holding a small kitchen knife loosely by his thigh and made no threatening gestures toward anyone).

As for the distance between suspect and officer, the facts show that at the moment force was applied, Brandon was on one side of the living room while Officer Thompson was at the door to the house—a distance of approximately twelve to fifteen feet. Doc. 1 ¶ 28. Further, the front door was a barrier between Brandon and the officers, which they simply could have closed and remained safely outside to consult with arriving backup officers. While courts have resisted adopting a bright line rule for a reasonable distance to apply deadly force, the 10th Circuit found a range near 12-15 feet to be unreasonable under similar circumstances because the suspect was not within striking distance of officers. *Tenorio*, 802 F.3d at 1166.

Finally, Brandon's manifest intentions were to be left alone in his home to clean his room alone. Throughout the encounter, he made the same request, for officers to leave his room, leave his home, and leave him alone. A reasonable juror could conclude that Brandon's innocent step towards Thompson manifested an intention to have the officers retreat outside the home. Indeed, when he took a step outside his bedroom towards Thompson in the basement, Thompson did just that. There was no reason for Brandon to believe his identical action in the living room would result in a different outcome. Brandon was barefoot and wearing shorts in the middle of winter. There was no indication he would have left the home. He kept his hands at his sides and made no moves that would suggest to a reasonable officer that he had malevolent intentions. To the contrary, a reasonable officer in the situation would have recognized Brandon's behavior as symptomatic of his known mental illness. He expressed repeatedly the need to prevent a plague by

cleaning his room and was pacing back and forth in his living room. A reasonable juror could conclude that Brandon's actions were consistent with an intention to drive the officers out of the home and inconsistent with any manifest intention to harm Thompson. Thus, the second Graham factor weighs in Plaintiff's favor.

The third *Graham* prong also favors Plaintiff. Officers are justified in using "*some* force" when a suspect resists arrest. *Surat v. Klamser*, 52 F.4th 1261, 1275 (10th Cir. 2022). However, the application of force must be reasonable and proportionate to the level of arrestee's resistance. *Id.* "When a suspect's resistance is ineffectual and non-threatening, officers are justified in using only 'minimal force' to subdue the suspect. *Ibarra*, 2023 WL 6939236, at *11 (10th Cir. Oct. 20, 2023) (quoting *Surat*, 52 F.4th at 1275). The Court should consider "whether the suspect was fleeing or actively resisting at the precise moment" force was employed. *Id.* As can be seen in the videos, and construing the facts in the light most favorable to Plaintiff, Brandon was not actively fleeing or resisting arrest at the moment Officer Thompson shot his firearm. Any arguable resistance that occurred was ineffective and non-threatening. Again, he made no threats to the officers or anyone else and simply wished to be left alone in his home. The law does not allow an officer to use deadly force because a mentally ill suspect does not follow commands. The use of deadly force was not proportionate or necessary to subdue Brandon.

Under both *Graham* and *Estate of Larsen*, the Court should conclude that Plaintiff has made a sufficient showing that Officer Thompson acted unreasonable. But, the analysis does not stop there. "The mentally ill or disturbed condition of the suspect is a relevant factor" in the reasonableness inquiry. *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1214 (10th Cir. 2019). An officer who is aware of a suspect's "diminished capacity to reason [] should take that into account before provoking a fatal encounter." *Arnold v. City of Olathe, Kan.*, 35 F.4th 778, 790 (10th Cir 2022) (internal quotations omitted).

11

Further, "[t]he reasonableness of [an officer's] actions depends both on whether the officers were in danger at the precise moment that they used force and on whether [the officer's] own reckless or deliberate conduct during the seizure unreasonable created the need for such force." *Tenorio*, 802 F.3d at 1164 (quoting *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995)). Deadly force is unreasonable, even in the face of immediate, severe danger, when the officer recklessly created the danger. *Estate Of Ceballos*, 919 F.3d at 1224-25. When assessing an officer's actions leading to the use of force, courts consider whether the acts are "immediately connected with the actual seizure." *Bella v. Chamberlain*, 24 F.3d 1251, 1256 n.7 (10th Cir. 1994). "One particularly important factor in identifying immediately connected conduct is the amount of time between the officer's actions and the use of force." *Arnold*, 35 F.4th at 790. But, still, the totality of the circumstances inquiry considers police conduct throughout the "*full encounter*, from its inception through the moment the officers employed force." *Estate of Taylor*, 16 F.4th at 765 (emphasis in original). Recklessness in these cases is "manifested mostly by police onslaught at the victim." *Arnold*, 35 F.4th at 789.

Officer Thompson was well aware of Brandon's mental illness. Not only did he have personal experience responding to prior calls prompted by Brandon's schizophrenia and paranoia, but in this particular case, dispatch chatter was recorded communicating the diagnosis and a history of Crises Assessment Team interventions to Thompson. Doc. 1 ¶ 11-12. He was also aware of prior disturbances involving knives. *Id.* Brandon's behavior throughout the encounter was consistent with his known mental illness and manifested a diminished capacity to reason. One of the first things Brandon said during the encounter was that he had to clean his room to prevent the spread of a new plague. TBC 3:15-3:18; Doc. 1 ¶ 8. Despite this, the officers escalated the situation by forcibly entering Brandon's bedroom, pointing guns, shouting commands, and threatening Brandon.

12

It is proper for the Court to consider the Officer's conduct during the whole encounter with Brandon because it was immediately connected to the seizure. The moment Thompson pulled his trigger cannot be viewed in a vacuum. Less than five minutes passed from the time officers arrived on the scene to the Thompson firing his weapon. The time spent directly engaging with Brandon was less than two minutes. The cases on this issue instruct that Officer Thompson's handling of the situation was reckless and heightened the atmosphere of tension and fear to unreasonable create the alleged need for deadly force.

In *Estate of Ceballos*, the court declined qualified immunity to an officer who shot a man within a minute of arriving on the scene after recklessly confronted the visibly intoxicated suspect who was pacing in his driveway, swinging a bat, yelling, and throwing his arms in the arm. 929 F.3d at 1216. The court found the officer's actions of quickly approaching the scene, shouting commands, drawing his weapon, and refusing to give ground as the suspect moved towards him warranted a finding that the officer recklessly precipitated the need for force. *Id*. at 1216. *Sevier* was decided on jurisdictional grounds but is still instructive.[5] There, officers responded to a 911 call reporting a young man with suicidal history was in his bedroom with a knife. *Id.* at 698. Officers unlocked the man's bedroom door and shouted commands at him with their weapons drawn. *Id.* The man walked to the door of his room, holding the knife in his hand, causing officers to retreat. *Id.* The suspect did not drop the weapon, despite commands to do so, and officers fired fatal shots. *Id.* The encounter lasted less than five minutes. *Id. a*t 698. The court found that a reasonable jury could conclude the officers acted recklessly by confronting the suspect in the manner they did "knowing he was armed and distraught…without gathering more information on the situation." *Id.* at 700 n. 10.

---

[5] Defendants' motion states that a case must bear "sufficient factual symmetry" to *Sevier* to be considered reckless. Doc. 10, p. 13.  This is simply not a correct statement of law.

13

Finally, consider *Hastings v. Barnes*, 252 Fed.Appx. 197 (10th Cir. 2007).[6] There, officers responded to a call by a man reporting he was suicidal and at home. *Id.* at 198-99. Officers arrived at the home, the suspect answered the door, and officers noted his behavior as agitated and evasive. *Id.* at 199. In response to officer requests that he step outside, the man retreated to his bedroom. *Id.* Officers entered the bedroom and found the suspect with a 20-inch blade Samurai sword. *Id.* They ordered him to drop the sword, but he did not comply. *Id.* at 200. The encounter continued with officers shouting commands to drop the weapon until they unsuccessfully pepper-sprayed him. *Id.* The man then turned the sword on the officers and walked towards them. *Id.* The suspect had walked three or four steps towards the officer and was within five feet when he was shot. *Id.* at 200 n. 6. The entire incident lasted less than four minutes. *Id.* at 200. Rather than attempt to help the suspect, the officers crowded themselves in his doorway, issued loud and forceful commands, pepper-sprayed him when he made no verbal or physical threats, and caused even more distress. *Id.* at 203. The court found these facts sufficient to defeat summary judgment on the question of whether the officers recklessly created the need for force. *Id.*

This case is in line with *Estate of Ceballos, Sevier*, *and Hastings*. Brandon was a mentally ill individual whose sister called the police for help managing his symptomatic outburst. The interaction between Brandon and the officers lasted less than two minutes. Rather than attempt to deescalate the already tense situation, the officers quickly entered the home without a plan, forced entry into his bedroom not once, but twice, with weapons drawn, crowded themselves in Brandon's bedroom and later his front doorway while shouting loud and forceful commands, and firing a taser at him twice. Brandon had not made any verbal or physical threats to the officers and showed

---

[6] "Although not dispositive ... because of its unpublished status, we have never held that a district court must ignore unpublished opinions in deciding whether the law is clearly established." *Estate of Ceballos*, 919 F.2d at 1217 n.3 (10th Cir. 2019) (citing *Hastings* as authoritative on these issues).

no signs of aggression. Officer Thompson did not account for Brandon's mental illness and condition and made an already tense situation worse. Beginning with the decision to forcibly re-enter Brandon's bedroom after Brandon closed the door and retreated, Officer Thompson took affirmative, reckless action to provoke the fatal encounter. The totality of the circumstances can only lead to one conclusion: Officer Thompson's actions were objectively unreasonable and the use of force was a violation of Brandon Lynch's constitutional rights. The first prong of the qualified immunity analysis is met.

**B. Brandon Lynch's Constitutional Right was Clearly Established at the Time of the Shooting.**

The second prong of the Court's inquiry asks whether the constitutional violation alleged was of a clearly established right. "To be clearly established, either Supreme Court or Tenth Circuit precedent must be on point or the clearly established weight of authority from other courts must agree with plaintiff's conclusion." *Estate of Larsen*, 511 F.3d at 1259. "We do not engage in a scavenger hunt for prior cases with precisely the same facts but examine whether the law put officials on fair notice that the described conduct was unconstitutional." *Tenorio*, 802 F.3d at 1164 (internal quotations omitted).

Defendants' motion does not reach this prong as they concluded no constitutional right was violated. This position completely ignores relevant precedent directly on point. The 10th Circuit has **"specifically established that where an officer had reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him, that it was unreasonable for the officer to use deadly force against the suspect."** *Tenorio*, 802 F.3d at 1165-66 (quoting *Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006) (emphasis added) (citing *Zuchel v. City & County of Denver*,

15

997 F.2d 730, 735-36 (10th Cir. 1993))). That is precisely what happened in this case, and officers have been on notice of this law for nearly thirty years.

Most critically, the *Tenorio* case provided ample notice to Officer Thompson that his conduct was unreasonable and unconstitutional. In that case, police were called to the suspect's home and were informed by dispatch that the suspect was drunk and holding a knife to his own throat. 802 F.3d at 1162. There were three other individuals in the home with Tenorio, who was in the kitchen waving the knife around. *Id.* When officers arrived, they entered the home without a tactical plan and with handguns drawn. *Id.* The front door of the home led into the living room, and the kitchen was on the opposite side of the room, approximately 16 feet away. *Id.* At the direction of the police officer, Tenorio's wife exited the kitchen into the living room, followed by Tenorio, who was followed by another man. *Id.* Tenorio was holding a santoku-style knife with a three-and-a-quarter inch blade loosely by his side. *Id.* at 1163. Officers saw the knife and yelled for Tenorio to drop it. *Id.* At the same time, Tenorio took approximately two and one-half steps into the living room at an average speed when an officer shot him. *Id.* The entire encounter lasted less than four minutes. *Id.*

The Court of Appeals affirmed the district court's denial of qualified immunity to the officer, finding his conduct was objectively unreasonable. The facts there supported a finding that Tenorio did not have time to comply with requests to drop his knife, made no hostile motions towards the officers (instead, holding the knife loosely by his side) and was shot before he was within striking distance of officers. *Id.* at 1164-65. These facts weighed against a finding that the use of force was justified. *Id.*[7] Like the suspect in *Tenorio*, Brandon Lynch was not charging at Officer Thompson, was not within striking distance, took no hostile or provocative action towards

---

[7] The court found this result was, indeed, compelled by circuit precedent set forth in *Zuchel* and *Walker*. *Tenorio*, 802 F.3d at 1165.

16

the officers, and had merely taken a single step towards the officers while loosely holding a small knife in one hand. The officers were also on notice that their reckless behavior in escalating the situation was unlawful. The case law "clearly establish[es] that an officer acts unreasonably when he aggressively confronts an armed and suicidal/emotional disturbed individual without gaining additional information or by approaching him in a threatening manner." *Hastings v. Barnes*, 252 Fed.Appx. 197, 206 (10th Cir. 2007).

The facts alleged in the Complaint, along with the video footage of the encounter, when viewed in the light most favorable to Plaintiff, meet both prongs of the test to overcome the defense of qualified immunity. Plaintiff has stated a plausible claim of excessive force against Officer Thompson, and the motion should be denied. At the very least, should the Court convert the motion to one for summary judgement, it must conclude that there are legitimate disputes of material fact on the critical issues—namely, whether Defendant Thompson's conduct was reasonable and whether it recklessly created the need for force.

### V. Plaintiff's Complaint Alleges Sufficient Facts to State a Claim for Municipal Liability Against Defendant the City of Olathe.

"[W]hen execution of a government's policy or custom, whether made by its lawmakers or by those whose edict or acts may fairly be said to represent official policy, inflicts the injury…the government as an entity is responsible under §1983." *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658, 694 (1978). Defendants dismiss Plaintiff's municipal liability claim on the basis that officer liability is precluded. However, as has been established, the claim against Officer Thompson is plausibly pled, and the Court must, therefore, consider the Plaintiff's allegations against the City of Olathe.[8]

---

[8] Defendants mislead the Court in stating the claim should be dismissed because Olathe Police Department is not a party. As the Complaint properly alleges, the Olathe Police Department was, at all relevant times, a constituent

The prove municipal liability, "the plaintiff must show: (1) a municipality enacted or maintained a policy, (2) the municipality was deliberately indifferent to the resulting constitutional violations, and (3) the policy caused the underlying constitutional violation." *Arnold*, 35 F.4th at 795. The first element can be established by "a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision." *Schneider*, 717 F.3d at 770. Liability for inadequate training of police officers in the use of force requires a showing that "(1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training." *Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003).

**A. The Facts Support a Claim of Inadequate Training.**

The Complaint alleges the following theories of municipal liability against the City: a practice of using excessive force (including deadly force) without regard for the need for such force, a practice of failing to act on and adequately punish officer use of excessive force, failure to train officers on when to use lethal force, failure to adequately train on crisis intervention responses, and failure to adequately train on safe de-escalation tactics. Doc. 1 ¶ 68. The first element of the failure to train claim is met because, taking the facts alleged a true and in the light most favorable to Plaintiff, the Complaint establishes the Officer Thompson used excessive force. It is very typical for officers to be called to handle situations like that presented here, and the

---

actor of the City of Olathe with final policymaking authority over the police force and was the employer of Defendant Thompson. Doc. 1 ¶ 3. References to the Department as a defendant are used for the sake of clarity and do nothing to destroy Plaintiff's claims.

Complaint makes specific allegations that the policies at issue result in deliberate indifference to the rights of citizens with whom the police come in contact. Doc. 1 ¶ 70.

The third element requires a showing that the City was on notice that its failures to act are substantially certain to result in a constitutional violation. *Carr*, 337 F.3d at 1229. "Even where the City's policy is not unconstitutional, a single incident of excessive force can establish the existence of an inadequate training program if there is some other evidence of the program's inadequacy." *Id.* Plaintiff makes specific allegations about the inadequate training policies and further alleges that the City's deliberate indifference to potential constitutional violation resulted from these failures. Doc. 1 ¶ 70, 73. These allegations, and the reasonable inference drawn therefrom, are enough. The facts alleged, if proven, would show that the City had notice that its failures in training officers on use of force, crisis management, and de-escalation were likely to produce constitutional violations, and the City nonetheless consciously disregarded that risk. Finally, the failure to adequately train officers directly caused the injury here. Doc. 1 ¶ 67, 72. The harm alleged (shooting and killing Brandon Lynch) is exactly the type of harm that is plausibly expected by the City's failure to properly train its officers on use of force, crisis management, and de-escalation. This is sufficient at the pleading stage. The Court should not cut off Plaintiff's ability to further discover the contours of the City's training practices and develop these theories of liability. At this point in litigation, the City holds all the cards. It has executed a stay of discovery pending the resolution of this motion, leaving Plaintiff unable to access even the most basic information to support its claims. Nonetheless, Plaintiff, through the Complaint's allegations, has met the pleading requirements and overcome the motion to dismiss. As the Court held in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2009) the pleading standard Rule 8 announces does not require "detailed factual allegations," Plaintiff's complaint, based on the information it has

been able to pry out of the hands of the City, is "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."

## VI. Conclusion.

In construing the facts of this case, the Court should be mindful that "since the victim of deadly force is unable to testify, courts should be cautious…to ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify." *Pauly*, 874 F.3d at 1217-18 (internal quotations omitted). The Court should not allow Officer Thompson's unreasonable use of force and reckless escalation of encounter to stand. The law is clear. The Court should deny Defendants' motion because the facts alleged establish that Defendant Thompson violated Brandon Lynch's constitutional right against unreasonable seizure and the right alleged was clearly established at the time of the shooting.

WHEREFORE, Plaintiff respectfully prays this Court for its Order DENYING Defendants' Motion to Dismiss and granting any and all further relief the Court deems just and equitable.

**Respectfully submitted,**

**CANNEZZARO MARVEL, LLC**

*/s/Michelle Marvel*
Michelle Marvel       KS#23511
Nikki Cannezzaro     KS#20138
4717 Grand Ave., Suite 130
Kansas City, MO 64112
Phone: (816) 641-5600
Fax: (816) 641-5601
Email: mmarvel@cmlawkc.com
Email: nikki@cmlawkc.com
***ATTORNEYS FOR PLAINTIFF***