## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**MARIA VARNAS, as Special Administrator of
the Estate of Brandon S. Lynch, Deceased,**

        **Plaintiff,**

        **v.**

**CONNER THOMPSON, et al.,**

        **Defendants.**

**Case No. 2:24-CV-02193-JAR-GEB**

## MEMORANDUM AND ORDER

Following the tragic death of her son, Plaintiff Maria Varnas filed this lawsuit, pursuant to 42 U.S.C. § 1983, as Special Administrator of the Estate of her son, Brandon S. Lynch, against the City of Olathe, Kansas ("the City") and Olathe Police Officer Conner Thompson ("Officer Thompson"), in his individual and official capacity.  Plaintiff alleges that Officer Thompson used excessive force against Lynch in violation of Lynch's Fourth and Fourteenth Amendment rights and that the City maintained policies that were the moving force behind Defendants' constitutional violations.  This matter is now before the Court on Defendants' Motion to Dismiss (Doc. 9) for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  The motion is fully briefed, and the Court is prepared to rule.  For the reasons stated below, the Court grants the motion in part and denies the motion in part.

### I.    Legal Standard

To survive a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), a complaint must contain factual allegations that, assumed to be true, "raise a right to relief above the speculative

level"[1] and must include "enough facts to state a claim for relief that is plausible on its face."[2] Under this standard, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."[3]  The plausibility standard does not require a showing of probability that "a defendant has acted unlawfully," but requires more than "a sheer possibility."[4]  "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."[5]  Finally, the Court must accept the nonmoving party's factual allegations as true and may not dismiss on the ground that it appears unlikely the allegation can be proven.[6]

The Supreme Court has explained the analysis as a two-step process. For the purposes of a motion to dismiss, the Court "must take all the factual allegations in the complaint as true, [but is] 'not bound to accept as true a legal conclusion couched as a factual allegation.'"[7]  Thus, the Court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[8]  Second, the Court must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief."[9]  "A claim has facial plausibility when the plaintiff pleads factual content

---

[1] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 555 (2007) (citing 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1216, at 235–36 (3d ed. 2004)).

[2] *Id.* at 570.

[3] *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174 1177 (10th Cir. 2007).

[4] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

[5] *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555).

[6] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

[7] *Id.* (quoting *Twombly*, 550 U.S. at 555).

[8] *Id.* at 678–79.

[9] *Id.* at 679.

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[10]

"Generally, a court considers only the contents of a complaint when ruling on a 12(b)(6) motion."[11]  However, an exception to the general rule limiting a court's review to the complaint applies when a document is referred to in the complaint, central to the plaintiff's claims, and no party disputes the document's authenticity.[12]  Here, Defendants filed with their motion the body camera footage of Officer Thompson and non-party responding Officer Willard, and the Declaration of Major Wesley Smith (authenticating the two videos).[13]  The parties agree that the Court can consider the body camera videos in ruling on Defendants' motion to dismiss without converting the motion to one for summary judgment, "as [the videos] are referenced in the Complaint and contain information central to Plaintiff's claims."[14]  In considering the video, the Court is mindful that it must accept all well-pleaded factual allegations as true, but if Plaintiff's factual allegations are directly contradicted by the video, the video controls.[15]

---

[10] *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

[11] *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1146 (10th Cir. 2013) (citing *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010).

[12] *Gee*, 627 F.3d at 1186 (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)).

[13] Doc. 10-1; Doc. 14 (body camera videos).  Defendants also filed with their motion authenticated transcripts of the body camera videos.  Doc. 18-1, Doc. 18-2.  The Court need not consider these transcripts in ruling on Defendants' motion because the videos speak for themselves.

[14] Doc. 21 at 2; *see Pace v. Swerdlow*, 519 F.3d 1067, 1072 (10th Cir. 2008) (concluding that the district court properly considered materials central to plaintiff's claim, referred to in the complaint, and indisputably authentic without converting defendant's motion to dismiss to one for summary judgment).

[15] *See Est. of Ronquillo ex rel. Est. of Sanchez v. City & County of Denver*, 720 F. App'x 434, 437 (10th Cir. 2017) (citing *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2010) ("When an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss."); and *Thomas v. Durastanti*, 607 F.3d 655, 672 (10th Cir. 2010) (applying this standard in the summary judgment context)).

## II.    Background

The following facts are derived from Plaintiff's Complaint and the body camera videos viewed in the light most favorable to Plaintiff.[16]  Brandon Lynch was a 27-year-old man suffering from behavioral and mental health symptoms, including schizophrenia.  He lived with his mother, Plaintiff Maria Varnas.

During the evening of December 31, 2022, Lynch became agitated, irritable, and paranoid about getting the plague.  This led to a physical altercation with his younger sister, M.L., who was home with Lynch at the time.  As instructed on prior occasions by Lynch's case worker, at approximately 11:10 p.m., M.L. called 911 to get help for Lynch.  She informed the dispatcher that Lynch had a history of schizophrenia and paranoia and was in a crisis.

Defendants were already aware of Lynch's schizophrenia diagnosis and history with the department's mental health crisis assessment team.  This was confirmed via law enforcement dispatch radio communication.  Radio chatter at the time stated: "Just information: There's a lot of CAT (Crisis Assessment Team) history here.  Also, with Brandon—Brandon Lynch—he's diagnosed, schizophrenia.  They had (garbled) disturbance here involving a knife in May. And then one before that, previously, maybe the year before.  Think it was just with kitchen knives."[17]

Officers Thompson and Willard arrived at Lynch's home at approximately 11:14 p.m. Both had previous contact with Lynch and were aware of his behavioral and mental health symptoms—Officer Thompson had a physical altercation with Lynch during a previous incident. When M.L. opened the front door and informed the officers that Lynch's bedroom was located in the basement, the officers instructed M.L. to wait outside in the front yard.  M.L. complied.

---

[16] Doc. 1; Doc. 14.

[17] Doc. 1 ¶ 11.

Officers Thompson and Willard proceeded downstairs to Lynch's bedroom.  They opened Lynch's bedroom door and attempted to communicate with him.  Lynch responded, "get out sir," followed by additional requests for the officers to get out.  Lynch informed the officers that he was cleaning to prevent starting a new plague.  Officer Thompson told Lynch that they needed to sort out what was going on.  After shouting, "I'm not going anywhere near you," Lynch closed his bedroom door.

Officer Thompson opened Lynch's bedroom door and continued to shout commands. Immediately after entering Lynch's bedroom, Officer Thompson ordered Lynch to "put that stun gun down," while pulling out his taser and aiming it at Lynch.  Officer Thompson also informed Lynch that he was under arrest.  Less than 15 seconds later, Officer Thompson ordered Lynch to "put the knife down," while pulling out his firearm and aiming it at Lynch.

Lynch became increasingly agitated and asked the officers to leave his bedroom and house multiple times.  The officers started to back down the hallway—repeatedly instructing Lynch to put the knife down—and Lynch followed them upstairs to the living room.  Officer Thompson took a position in the front doorway with Officer Willard standing slightly behind him.  Officer Willard unsuccessfully deployed his taser toward Lynch.  Officer Thompson continued to order Lynch to put his weapons down while Lynch paced side to side in the living room about 12–15 feet from the home's entryway.  Lynch's actions displayed that he was in a mental health crisis.

At 11:18 p.m., just over four minutes after Officers Thompson and Willard arrived, radio chatter confirmed "Olathe just put out an assist the officer . . . East Oakview."[18]  Officer Willard deployed his taser a second time toward Lynch, which was also unsuccessful.  Sirens could be

---

[18] Doc. 1 ¶ 31.

heard in the background as additional officers arrived for backup.  Instead of closing the door and consulting with the arriving backup officers to develop a de-escalation plan, Officer Thompson continued to instruct Lynch to drop his weapons and warned him not to move forward.  Crisis intervention training teaches that the officers' tactics—pointing guns, shouting commands, and threatening Lynch—exacerbate the situation and are counterproductive in addressing a person in mental health crisis.

At approximately 11:19 p.m., Lynch took one or two steps toward Officer Thompson at a slow pace.  Officer Thompson fired three shots at Lynch's torso fatally wounding him before he was within striking distance of the officers.

## III.  Discussion

Both of Plaintiff's claims arise under 42 U.S.C. § 1983.  In Count I of the Complaint, Plaintiff alleges that Officer Thompson used excessive force in violation of Lynch's Fourth and Fourteenth Amendment rights.  In Count II, Plaintiff alleges that the City, acting through its constituent, the Olathe, Kansas Police Department, had policies and procedures that were the moving force behind Lynch's constitutional deprivations.  Under § 1983, a plaintiff must establish that (1) the defendant acted under the color of state law and (2) the actions deprived the plaintiff of rights, privileges, or immunities secured by the Constitution and laws of the United States.[19]

Neither party disputes that Plaintiff has sufficiently alleged that Defendants acted under the color of state law.  The dispute is whether Plaintiff has alleged facts showing that Defendants deprived Plaintiff of rights, privileges, or immunities secured by the Constitution.  Defendants claim that Plaintiff has failed to allege facts showing that Defendants violated any constitutional

---

[19] 42 U.S.C. § 1983.

rights.  Defendants further argue that Officer Thompson is entitled to qualified immunity and cannot be held liable in his individual capacity.

### A.  Excessive Use of Force

Both Counts I and II rely on the same underlying constitutional violation—Officer Thompson's alleged excessive use of force against Lynch.  Thus, the Court first evaluates whether Plaintiff has alleged sufficient facts to support excessive force.

Allegations of excessive force are evaluated under the Fourth Amendment's reasonableness standard.[20]  "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."[21]  Although Plaintiff alleges that Officer Thompson's use of excessive force violated Lynch's Fourth and Fourteenth Amendment rights, Officer Thompson's actions in shooting Lynch were clearly a seizure,[22] and, therefore, only the Fourth Amendment applies.

Plaintiff alleges that Officer Thompson used excessive force against Lynch when he shot Lynch three times, resulting in Lynch's death.  To state a claim of excessive force under the Fourth Amendment, a plaintiff must show both that a "seizure" occurred and that the seizure was "unreasonable."[23]  There is no argument here that Lynch was not seized.  Thus, the Court must consider whether the seizure was unreasonable.

---

[20] *Graham v. Connor*, 490 U.S. 386, 395 (1989).

[21] *Id.* (emphasis omitted).

[22] *Brower v. County of Inyo*, 489 U.S. 593, 596–97 (1989) (holding that a seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied").

[23] *Id.* at 599.

Under the Fourth Amendment reasonableness standard, an officer's use of deadly force is "justified . . . if a reasonable officer in [the officer's] position would have had probable cause to believe that there was a threat of serious physical harm to themselves or others."[24]  In *Graham*, the Supreme Court identified three factors to determine whether an officer's use of force is reasonable in light of the surrounding facts and circumstances: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."[25] But in analyzing the surrounding facts and circumstances, courts must judge the officer's actions from the perspective of a reasonable officer on the scene, who is "often forced to make split-second judgments . . . about the amount of force that is necessary in a particular situation."[26]

"In addition to the *Graham* . . . factors, [courts] must also consider whether an officer's 'reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'"[27]  Although courts applying the Fourth Amendment reasonableness standard "scrutinize only the seizure itself, [and] not the events leading to the seizure, . . . 'events immediately connected with the actual seizure are taken into account.'"[28]  "The mentally ill or disturbed condition of the suspect is a relevant factor in determining reasonableness of an officer's responses to a situation."[29]

---

[24] *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995) (citations omitted).

[25] *Graham*, 490 U.S. at 396.

[26] *Id.* at 396–97.

[27] *Arnold v. City of Olathe*, 35 F.4th 778, 789 (10th Cir. 2022) (citations omitted) (quoting *Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997)).

[28] *Id.* (quoting *Bella v. Chamberlain*, 24 F.3d 1251, 1256 n.7 (10th Cir. 1994).

[29] *Est. of Ceballos v. Husk*, 919 F.3d 1204, 1214 (10th Cir. 2019).

## 1. First Graham Factor: Severity of Crime

The first *Graham* factor, the severity of the crime at issue, weighs in Plaintiff's favor. Defendants argue that the genesis of M.L.'s 911 call was an assault and battery—a violent crime. However, as Defendants concede, the Complaint alleges that M.L.'s 911 call was for a "welfare check."[30]  The Complaint makes clear that "M.L. called 911 to get help for her brother" and "reported to the dispatcher that [Lynch] had a history of schizophrenia, paranoia, and was in crisis."[31]  At the motion to dismiss stage, the Court must accept factual allegations made in the Complaint as true.  Although the injuries to M.L.'s lip are visible in the body camera videos, the Court does not believe that these injuries make clear the reason for M.L.'s 911 call, and thus do not clearly contradict Plaintiff's allegation that the officers were called to get help for Lynch.

## 2. Second Graham Factor: Immediacy of Threat

"The second *Graham* factor, 'whether the suspect pose[d] an immediate threat to the safety of the officers or others,' is undoubtedly the 'most important' and fact intensive factor in determining the objective reasonableness of an officer's use of force."[32]  In assessing this *Graham* factor, courts consider the non-exclusive so-called *Larsen* factors: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect."[33]  After considering the *Larsen* factors, the third *Graham* factor also weighs in favor of Plaintiff.  In fact, three of the four *Larsen* factors are in Plaintiff's favor.

---

[30] Doc. 10 at 10.

[31] Doc. 1 ¶ 9.

[32] *Pauly v. White*, 874 F.3d 1197, 1215–16 (10th Cir. 2017) (alteration in original) (first quoting *Graham*, 490 U.S. at 396; and then quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)).

[33] *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

The first *Larsen* factor weighs in Defendants' favor.  Indeed, Plaintiff concedes that the officers ordered Lynch to drop the knife several times, and it is clear from the Complaint and the body camera videos that Lynch did not comply with these orders.  However, under Plaintiff's version of the facts, which the Court must accept as true, Lynch never made any hostile motions toward the officers, which is the second *Larsen* factor.  Nor do the body camera videos, viewed in the light most favorable to Plaintiff, show Lynch making hostile motions toward the officers.  For example, Lynch did not raise the knife above his head in a striking position or lunge at the officers.

The third *Larsen* factor is the distance separating the officers and Lynch.  While there is no bright line rule regarding the minimum distance required to use lethal force against a knife-wielding individual, this factor weighs in Plaintiff's favor when the factual allegations in the Complaint are assumed to be true and the body camera video is viewed in the light most favorable to Plaintiff.  Specifically, Plaintiff alleges that Lynch was 12–15 feet from the officers, not within striking distance, and holding a knife when he was shot.  The body camera videos do not clearly contradict this allegation.  The Court focuses on the knife, as opposed to the stun gun Defendants allege Lynch held, because the Complaint does not refer to the stun gun and it is not clear from the body camera videos that Lynch held a stun gun.

The fourth *Larsen* factor, Lynch's manifest intentions, also weighs in Plaintiff's favor.  Lynch repeatedly asked the officers to get out of his room and home, asked the officers what he did wrong, and communicated his desire to continue cleaning up to avoid starting a new plague.  Lynch did not verbally threaten the officers.  While Lynch did yell and use profanity towards the officers, that could reasonably be perceived as Lynch manifesting his strong desire be left alone to clean.  Furthermore, viewing the facts and body camera videos in the light most favorable to

Plaintiff, Lynch did not display any physical signs of aggression or violence towards the officers. At most, according to Plaintiff, Lynch took two slow steps towards the officers while holding a knife.

Furthermore, Lynch never posed an immediate threat to the safety of anyone else. The only other individual present during Lynch's interaction with the officers was M.L., and she remained outside of the home at the officers' request.

### 3. Third Graham Factor: Resisting or Evading Arrest

The third *Graham* factor, whether the suspect was resisting or attempting to evade arrest, weighs in favor of Defendants. The body camera videos make clear that, despite the officers' announcements that Lynch was under arrest, Lynch did not submit to the officers' authority. Instead, Lynch asked the officers why he was being arrested and told the officers to leave his home—clearly resisting the arrest.

### 4. Officer's Reckless or Deliberate Conduct

Finally, the Court must consider whether the officer's reckless or deliberate conduct during the seizure unreasonably created the need to use such force. Here, Plaintiff alleges that Officer Thompson "recklessly created the situation resulting in use of excessive and deadly force" by continuing to "shout at, threaten, and agitate [Lynch], a person with known behavioral and mental health symptoms, when no one was in danger."[34] Plaintiff further alleged that "[c]risis intervention training teaches that these tactics exacerbate the situation and are counterproductive in addressing a person in mental health crisis" and that officers should instead "use a calm and non-threatening tone, ask open-ended questions, and avoid confrontational

---

[34] Doc. 1 ¶ 41.

language."[35]   These allegations, accepted as true, state a plausible claim that Officer Thompson

recklessly or deliberately brought about the need to use deadly force.  Moreover, the officers'

attempts to use their taser—a means of nonlethal force—while Lynch "plainly display[ed] that

he was in mental health crisis" can also be seen as recklessly or deliberately creating the need to

use deadly force.  Therefore, even if the Court found that Officer Thompson had the necessary

probable cause to believe at the time of the shooting that there was a threat of serious physical

harm to himself or others that would justify his use of deadly force, the Court would find, under

the facts as alleged, that Officer Thompson recklessly or deliberately brought about the need to

use deadly force.  This is enough to survive a motion to dismiss.

Thus, although one of the *Graham* factors—and other facts such as Lynch's refusal to

drop his knife when ordered to do so—weighs in Defendants' favor, after considering the totality

of the circumstances, the Court concludes that Plaintiff's factual allegations and the body camera

videos viewed in the light most favorable to Plaintiff sufficiently demonstrate that Officer

Thompson used excessive force in violation of Lynch's Fourth Amendment rights.

## B.  Qualified Immunity

Although the Court has determined that Plaintiff's factual allegations and the body

camera videos viewed in the light most favorable to Plaintiff demonstrate that Officer Thompson

violated a constitutional right, Officer Thompson raises the defense of qualified immunity.  "The

doctrine of qualified immunity shields public officials . . . from damages actions unless their

conduct was unreasonable in light of clearly established law."[36]  "[T]his affirmative defense

---

[35] *Id.* ¶¶ 37, 58.

[36] *Elder v. Holloway*, 510 U.S. 510, 512 (1994).

'creates a presumption that [the defendant is] immune from suit.'"[37]  To overcome this
presumption, the plaintiff carries the burden of establishing: "(1) that the defendant's actions
violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly
established at the time of the defendant's unlawful conduct."[38]  Because the Court has already
determined that Plaintiff sufficiently alleged the violation of a constitutional right, the Court
must determine whether that constitutional right was clearly established.

"A Government official's conduct violates clearly established law when, at the time of
the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable
official would [have understood] that what he is doing violates that right.'"[39]  "To make such a
showing in our circuit, 'the plaintiff must point to a Supreme Court or Tenth Circuit decision on
point, or the clearly established weight of authority from other courts must have found the law to
be as the plaintiff maintains.'"[40]  The Court's "analysis is not a scavenger hunt for prior cases
with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for
the officials to have been on notice of clearly established law."[41]  Courts simply require that
existing precedent place the constitutional question "beyond debate."[42]

---

[37] *Est. of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020) (second alteration in original) (quoting *Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016)).

[38] *Cillo v. City of Greenwood Vill*, 739 F.3d 451, 460 (10th Cir. 2013).

[39] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

[40] *Cox v. Wilson*, 971 F.3d 1159, 1171 (10th Cir. 2020) (quoting *Callahan v. Unified Gov't of Wyandotte Cnty.*, 806 F.3d 1022, 1027 (10th Cir. 2015)).

[41] *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021) (quoting *Reavis v. Frost*, 967 F.3d 978, 992 (10th Cir. 2020)).

[42] *Ashcroft*, 563 U.S. at 741.

Here, the Court agrees with Plaintiff that under *Tenorio v. Pitzer*, Officer Thompson's constitutional violation was clearly established at the time of Lynch's death.[43]  In *Tenorio*, the Tenth Circuit agreed with the district court that a reasonable jury could find that Tenorio's constitutional rights were violated.[44]  Specifically, when Tenorio was fatally shot by the defendant officer, he displayed diminished mental capacity, held a small knife and made no aggressive move toward the officers with the knife, was not charging the officer and instead took three steps toward the officer, was in the same living room with the officer but not within striking distance, and refused the officers' orders to drop the knife.[45]  All of these facts are similarly alleged by Plaintiff and not clearly contradicted by the body camera videos.

*Estate of Ceballos v. Husk* also clearly established that Officer Thompson's constitutional violation as alleged was clearly established at the time of Lynch's death.[46]  In *Estate of Ceballos*, officers responded to a call from Ceballos's wife reporting that Ceballos was drunk, probably on drugs, and acting crazy with baseball bats.[47]  Prior to the officers arriving, the dispatcher also indicated that Ceballos was known to have knives.[48]  When responding officers arrived, they approached Ceballos while Ceballos was in the driveway holding a bat.  The officers ordered Ceballos to drop the bat.  Instead of dropping the bat, Ceballos went into the garage then emerged from the garage holding the bat and began walking towards the officers.  With their weapons drawn, the officers repeatedly shouted commands for Ceballos to drop the bat.  The evidence was conflicted as to the speed Ceballos walked toward the officers and whether the

---

[43] 802 F.3d 1160 (10th Cir. 2015).

[44] *Id.* at 1164–65.

[45] *Id.* at 1163–65.

[46] 919 F.3d 1204 (10th Cir. 2019).

[47] *Id.* at 1209.

[48] *Id.*

officers continued to advance toward Ceballos or stopped their approach to give him an opportunity to comply with their commands. It was, however, undisputed that Ceballos did not comply with the officers' commands and instead responded with profanity directed at the officers. At some point, one of the officers fired their taser and Officer Husk fired his gun, fatally wounding Ceballos.[49]

The Tenth Circuit held that under the plaintiff's version of the facts, a reasonable officer in Husk's position would have known that his conduct violated Ceballos's Fourth Amendment right to be free from excessive force.[50] Specifically, the court stated "that an officer violates the Fourth Amendment when his or her reckless or deliberate conduct results in the need for lethal force or when the officers rely on lethal force unreasonably as a first resort in confronting an irrational suspect who is armed only with a weapon of short-range lethality and who has been confined on his own property," and that this was a "clearly established" constitutional right.[51]

Here, like in *Estate of Ceballos*, the officers were aware of Lynch's diminished capacity. And, like in *Estate of Ceballos*, the 911 dispatcher alerted the responding officers to this fact. Similarly, in *Estate of Ceballos* and the case at hand, when the officers arrived, they observed that their targets had diminished capacity. In *Estate of Ceballos*, Ceballos was "swinging a bat and yelling at no one in particular" and here, Lynch was pacing and yelling about the plague.[52] Also, in *Estate of Ceballos*, like the case at hand, the individual that called 911 made the dispatcher aware of their family member's diminished capacity.[53] Lastly, in both cases, the

---

[49] *Id.* at 1210–11.

[50] *Id.* at 1217.

[51] *Id.* at 1219.

[52] *See id.*

[53] *Id.*

defendant officers yelled orders at the individuals and refused to give ground when the individuals approached.[54]  The *Estate of Ceballos* court explained that a jury could reasonably find that an objective officer in Husk's position should have recognized Ceballos's diminished capacity and taken that into account before provoking a fatal encounter.[55]

Similarly, *Allen v. Muskogee*,[56] which *Estate of Ceballos* relied on in its holding, further supports the Court's finding that Officer Thompson's constitutional violation was clearly established. There, the Tenth Circuit stated that a reasonable jury could conclude that the officers' actions—approaching Allen, who was reportedly emotionally distraught, repeatedly giving him orders, and attempting to seize his gun—"were reckless and precipitated the need to use deadly force."[57]  This was true despite the fact that there were members of the public in the area and Allen had reportedly threatened family members and pointed his gun at an officer.[58]

Thus, the Court denies Defendants' motion to dismiss Count I against Officer Thompson in his individual capacity.  Plaintiff has met her burden of establishing that Officer Thompson violated Lynch's constitutional right and that the right was clearly established; therefore, Officer Thompson is not entitled to qualified immunity.

### C.  Municipal Liability

A municipality may not be held liable under § 1983 simply because it employs a person who is liable under § 1983.[59]  Instead, to hold a municipality liable under § 1983 for acts of its employees, a plaintiff must establish that the municipality has a policy or custom that directly

---

[54] *Id.*

[55] *Id.* at 1216–17.

[56] 119 F.3d 837 (10th Cir. 1997).

[57] *Id.* at 839–41.

[58] *Id.*

[59] *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 694 (1978).

caused the constitutional deprivation of rights.[60]  A plaintiff may show that a municipality has

such a policy or custom in at least five ways: (1) "a formal regulation or policy statement"; (2) an

informal custom that is "a widespread practice that, although not authorized by written law or

express municipal policy, is 'so permanent and well settled as to constitute a "custom or usage"

with the force of law'"; (3) "the decisions of employees with final policymaking authority"; (4)

ratification of the subordinate employees' actions by employees with final policymaking

authority; and (5) failure to train or supervise employees resulting from a deliberate indifference

to the injuries that may be caused by that failure.[61]

    In Count II, Plaintiff alleges that the City maintained policies, procedures, practices, and

customs that were the moving force behind Lynch's constitutional deprivations.  Specifically,

Plaintiff alleges that the City failed to adequately train its officers.

    To state a claim for municipal liability under § 1983 for inadequate training or

supervision of police officers in use of force, a plaintiff must first allege that the training was

inadequate, and then allege facts that show:

> (1) the officers exceeded constitutional limitations on the use of
> force; (2) the use of force arose under circumstances that constitute
> a usual and recurring situation with which police officers must
> deal; (3) the inadequate training demonstrates a deliberate
> indifference on the part of the city toward persons with whom the
> police officers come into contact; and (4) there is a direct causal
> link between the constitutional deprivation and the inadequate
> training.[62]

---

[60] *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993).

[61] *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010) (citations omitted) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).

[62] *Allen v. Muskogee*, 119 F.3d 837, 841–42 (10th Cir. 1997) (citing *Zuchel v. City & County. Of Denver*, 997 F.2d 730, 734–35 (10th Cir. 1993)); *see also Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003).

Defendants first argue that there can be no municipal liability because there is no underlying constitutional violation.  As explained above, the Court disagrees and concludes that Plaintiff has sufficiently alleged facts establishing that Officer Thompson violated Lynch's constitutional right.

Defendants next argue that Plaintiff's municipal liability claim should be dismissed because Plaintiff failed to allege facts beyond Lynch's own experience that go to the "deliberate indifference" element.  The Court disagrees.

"The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."[63]  "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."[64]  "In most instances, notice can be established by proving the existence of a pattern of tortious conduct."[65]  The deliberate indifference standard has been described by the Supreme Court as "a stringent standard of fault."[66]

The Court agrees with Defendants that Plaintiff has not alleged facts beyond Lynch's own experience, and thus has not established a pattern of tortious conduct giving rise to an inference of deliberate indifference.[67]  However, deliberate indifference may be found absent a

---

[63] *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).

[64] *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

[65] *Waller v. City & County of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) (quoting *Barney*, 143 F.3d at 1307).

[66] *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997).

[67] *See, e.g.*, *Waller*, 932 F.3d at 1287 (concluding that even an allegation of one similar prior incident was insufficient to constitute a pattern of conduct giving rise to an inference of deliberate indifference).

pattern of unconstitutional behavior in a "'narrow range of circumstances' where 'a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction.'"[68]  Here, Plaintiff's Complaint alleges facts that, if accepted as true, qualify for this narrow exception.  Specifically, Plaintiff alleges that the City failed to train its officers on use of force, crisis management, and de-escalation.  A highly predictable and plainly obvious consequence of a failure to train officers in these areas is the use of excessive force resulting in constitutional violations.

Thus, the Court denies Defendants' motion to dismiss Count II against the City.  Plaintiff has met her burden of alleging sufficient facts to support her claim that the City's failure to train its officers resulted in the violation of Lynch's constitutional rights.

### D.  Official Capacity Claim Against Officer Thompson

Plaintiff also asserts a violation of § 1983 against Officer Thompson in his official capacity.  Defendants move to dismiss this official capacity claim, alleging that it is redundant in light of the claims against the City.  The Court agrees.

In *Kentucky v. Graham*, the Supreme Court explained that a suit against an individual in his official capacity is really "only another way of pleading an action against an entity of which an officer is an agent."[69]  "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."[70]  Applying *Graham*, courts in this district have routinely dismissed official capacity

---

[68] *Id.* at 1284 (quoting *Barney*, 143 F.3d at 1307–08).

[69] 473 U.S. 159, 165 (1985) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, n. 55 (1978)).

[70] *Id.* at 166.

claims against a state official when plaintiffs also name the local public entity of which the officer is an agent, such as the city or police department, as a defendant.[71]

Accordingly, the Court dismisses the official-capacity claim against Officer Thompson in Count I because it is redundant to Count II against the City.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion to Dismiss (Doc. 9) is **granted in part and denied in part**.  The motion is granted with respect to Count I as against Defendant Officer Thompson in his official capacity.  The motion is otherwise denied.

**IT IS SO ORDERED.**

Dated: October 30, 2024

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[71] *See, e.g.*, *Douglass v. Garden City Cmty. Coll.*, 543 F. Supp. 3d 1043, 1057 (D. Kan. 2021) (collecting cases).